WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR 11-2265-PHX-JAT-003 |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| Rafiq Brooks, et al., ) | |
| Defendants. ) | |

Pending before the Court is Defendant Rafiq Brooks' Motion to Suppress Evidence Obtained Via GPS Monitoring.(Doc. 110; Doc. 122; Doc. 200). The Court held an evidentiary hearing on this Motion on October 31, 2012 at 1:00 p.m. and November 5, 2012 at 9:00 a.m..

**I.    Background**

Beginning in March 2011, a task force of agents and officers of the Drug Enforcement Agency (DEA), along with local law enforcement, investigated a group of individuals suspected of shipping marijuana through the mail.[1]

Detective Kurt Kinsey and Officer Anthony Morse testified that the investigation of this Drug Trafficking Organization (the "DTO") began while they were investigating a

---

[1] Although there are various facts regarding the investigation of Defendants in this matter, this background section only attempts to set forth the facts relevant to the motion at issue.

suspect in a separate investigation, not at issue here. Detective Kinsey testified that, based on the travels of this suspect, the investigators began to suspect the Pillars at Scottsdale, 17212 N. Scottsdale Road, Apartment # 2072 (the "Scottsdale Apartment") was being used as a location for the packaging and shipping of marijuana.

Detective Kinsey and Officer Morse testified that, from their experiences and past investigations, rental vehicles were often used in drug trafficking activities. Detective Kinsey testified that he observed several rental vehicles come to the Scottsdale Apartment and individuals carrying shipping materials into the house. Detective Kinsey testified that, in April of 2011, with the assistance of United States Postal Service Investigator Jeff Agister ("UPSI Agister"), a search warrant was executed on two boxes that a man, who investigators followed from the Scottsdale Apartment to the Post Office, attempted to mail, revealing marijuana. Detective Kinsey testified that, on another date in April, officers observed two Hispanic males exit the Scottsdale Apartment and place a large blue bag in the backseat of a Buick Rendezvous. A traffic stop executed on the vehicle revealed roughly $296,000 inside the bag and some marijuana shavings. Detective Kinsey testified that, in August of 2011, two men were observed loading the contents of the Scottsdale Apartment into a U-Haul truck and driving to the Pillars at Westgate on 93rd Avenue. Detective Kinsey testified that Officer Morse entered the complex to determine the exact apartment and observed the men unload the contents of the U-Haul truck into an apartment unit and garage, later identified as unit 3096 (the "Glendale Apartment").

Detective Kinsey testified that the Pillars at Westgate is a large complex with 251 units broken up into several buildings, each identified by a letter. He further testified that on June 6, 2011, a pole camera was installed at the Jobing.com Arena that provided a view of the front of the building where the Glendale Apartment was located. Detective Kinsey testified that unit 3096 is on the third floor of building L, accessible from an eastern access stairwell and breezeway. Detective Kinsey testified the stairwell is accessible to everyone in the complex. Detective Kinsey testified the complex was surrounded by a 5 foot 10 inch wall broken up by wrought iron fencing. The wall enclosed the apartment buildings, open

1  parking spaces around the perimeter for tenants and guests, and covered parking spaces.
2  Detective Kinsey testified that the interior of the complex could be viewed by drivers outside
3  the complex through the spaces of the wrought iron fencing. Detective Kinsey testified that,
4  beneath the second floor apartments were carports, with a garage or storage area in front of
5  each, and the garage assigned to the Glendale Apartment had the number "52" on it.
6  Detective Kinsey testified that observations from the pole camera revealed similar patterns
7  of activity as were observed at the Scottsdale Apartment.

8        Detective Kinsey testified that, on November 9, 2011, he personally put a slap-on
9  style Global Positioning Satellite ("GPS") device on the bottom of a silver Buick (the "silver
10 Buick"). Detective Kinsey further testified that, at 3:00 a.m on November 9, he and another
11 officer parked outside of the main office, and walked in an unlocked pedestrian gate to reach
12 the silver Buick. He further testified that, when he placed the GPS on the silver Buick it was
13 parked partially under the apartment structure, in front of the garage assigned to the Glendale
14 Apartment, and adjacent to the stairwell. Detective Kinsey testified that there were no
15 divisions or physical barriers preventing him from walking through the parking area. He
16 further testified that there were pillars holding up the structure, but no physical barriers
17 between the parking spots underneath the overhang and that people walked underneath the
18 overhang to reach the breezeway to access the stairwell.

19       Detective Kinsey testified the GPS tracker was on the vehicle from November 9, 2011
20 to November 11, 2011. Detective Kinsey testified that the rental record showed the silver
21 Buick had been rented on October 10, 2011 to Brandi Hawkins, with the secondary driver
22 listed as Chadwick Meyers (a.k.a. co-defendant Koy Kayon Williams). Detective Kinsey
23 testified that the GPS was attached to this vehicle because of the patterns observed, the
24 history of rental vehicles being used by suspects in this investigation, and his knowledge
25 based on the traffic stops previously conducted.

26       Detective Kinsley testified that, at about 9:30 a.m. on November 9, 2011, the pole
27 camera at the Jobing.com Arena showed two men, later identified as co-defendant Williams
28 and Defendant Brooks, leaving the Glendale Apartment. Detective Kinsey testified that he

1 used the GPS on the silver Buick to determine the Buick's location in order to begin physical 2 surveillance.[2] Detective Kinsey testified that he and another officer began physical 3 surveillance at Cave Creek and Bell, and followed the silver Buick to an apartment on 4 Highland Avenue (the "Highland Apartment"). Detective Kinsey testified that he was unsure 5 at the time which unit the men entered, but after about an hour the silver Buick, being driven 6 by an individual later identified as Defendant Brooks, was observed leaving the Highland 7 Complex. Detective Kinsey testified that he and another officer followed the silver Buick to 8 the 59th Avenue Post Office in Glendale (the "Post Office"). Detective Kinsey testified that 9 he used the GPS to locate the silver Buick when he lost visual on the vehicle at various points 10 during the trip to the Post Office. Detective Kinsey testified that Defendant Brooks traveled 11 to a post office roughly twenty to thirty minutes away from the Highland Apartment, 12 although Detective Kinsey believed there were closer post offices.

13 Detective Kinsey testified that he arrived in the parking lot at the Post Office just as 14 Defendant Brooks was exiting his vehicle carrying a box. Detective Kinsey testified that 15 Defendant Brooks entered the Post Office and attempted to mail the box. Detective Kinsey 16 testified that, with the aid of USPI Agister, pursuant to a search warrant, the box was seized 17 and marijuana was found inside. Detective Kinsey testified that Officer Cecilia Strabala saw 18 the silver Buick return to the Highland Complex and enter the garage for the Highland 19 Apartment. Detective Kinsey testified that, based on his investigation, he was confident that 20 the Highland Apartment was the new stash house used by the DTO. On November 17, 2011, 21 officers arrested Defendant Brooks and others at the Highland Apartment.

22 **II.    Analysis**

23 Defendant argues that the evidence[3] obtained via GPS tracking should be suppressed

---

[2] On the November 9, 2011, DEA agents used surveillance from this GPS device on the silver Buick, plain view observation, and a pole camera to monitor the silver Buick's movements.

[3] Defendant argues the following evidence should be suppressed: the package of marijuana placed in the mail on November 9, 2011, the presence of Mr. Brooks or the

- 4 -

because (1) law enforcement agents placed the GPS tracking device on the silver Buick without a warrant and (2) agents trespassed upon the curtilage of his residence in order to place the device on his vehicle.

In response, the Government argues that the Good-Faith Exception should be applied to the evidence gathered from GPS monitoring because law enforcement relied in good faith on then-existing judicial precedent that such monitoring was constitutional without a warrant, and there was no invasion on the curtilage of the Defendant's residence when the GPS device was attached to the vehicle.

The Court will now address each of Defendant's arguments.

### A.   Good Faith Exception

To support his argument that evidence obtained from warrantless GPS monitoring should be suppressed, Defendant relies on the recent decision in *United States v. Jones,* in which the Supreme Court of the United States held that law enforcement officers cannot attach a GPS tracking unit to a vehicle without a warrant. *United States v. Jones*, __ U.S. __, 132 S. Ct. 945, 947 (2012). Under the Supreme Court's decision in *United States v. Davis*, "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Davis v. United States*, __ U.S. __, 131 S. Ct. 2419, 2434 (2011). In *Davis*, the Court upheld a police search of a vehicle incident to arrest conducted in compliance with then-binding Eleventh Circuit precedent, prior to the precedent being overruled. *Id.* at 2428-89. The Court reasoned that the primary purpose of the exclusionary rule, deterrence of law enforcement violations of the Fourth Amendment, would not be served by punishing non-culpable, innocent police conduct. *Id.* at 2429.

Recently, the Ninth Circuit Court of Appeals held that suppression of evidence obtained from the attachment of a GPS monitoring device prior to *Jones*, was not warranted

---

silver Buick at any location (including the arrest scene) to which he and/or it were tracked using the GPS device, any evidence seized from the vehicle as a result of tracking it to any location (i.e., the firearm), and any evidence of the "pattern" of the silver Buick's comings and goings. (Doc. 110).

- 5 -

1 because agents objectively relied on then-existing binding precedent when they attached the
2 devise to defendant's car. *United States v. Pineda-Moreno*, 688 F.3d 1087, 1091 (9th Cir.
3 2012)**.**

4 In this case, the actions of law enforcement, made in reasonable objective reliance on
5 binding Ninth Circuit precedent are protected by the good faith exception to the exclusionary
6 rule. The police in this case attached and used the mobile tracking device in compliance with
7 then-binding circuit precedent that held placing a tracking device on the undercarriage of a
8 car and subsequently tracking its movement was neither a search nor a seizure under the
9 Fourth Amendment. *United States v. McIver*, 186 F. 3d 1119, 1126 (9th Cir. 1999). As in
10 *Davis* and *Pineda-Moreno*, this type of non-culpable police conduct undertaken in reliance
11 on then-binding circuit precedent does not warrant the suppression of the evidence obtained
12 by the GPS monitoring in this case. *See United States v. Nwobi*, CR 10-952 C GHK-7, 2012
13 WL 769746, at *4 (C.D. Cal. 2012) (finding good faith exception applied to warrantless GPS
14 tracking), *United States v. Leon*, 856 F. Supp. 2d 1188, 1195 (D. Haw. 2012) (same), *United
15 States v. Tan*, CR 2:10-0262 WBS, 2012 WL 3535887, at *2 (E.D. Cal. 2012) (same). Law
16 enforcement agents in this case, under substantially similar facts to *Pineda-Moreno* and,
17 relying in good faith on the same then-binding precedent of *McIver* as the agents in *Pineda-*
18 *Moreno*, are shielded from the exclusionary rule for their placement of the GPS device on
19 the silver Buick.

20         **B.**      **Curtilage**

21 Defendant next argues that, because law enforcement agents invaded the curtilage of
22 his residence to place the GPS device on the silver Buick, the evidence obtained as a result
23 of that trespass should be suppressed.

24         **1.**      **Legal Standard**

25 It is a well established rule that invasion upon the curtilage of the home requires a
26 warrant, absent exigent circumstances. *United States v. Dunn*, 480 U.S. 294, 300 (1987).
27 Both Defendant and the Government recognize that the Court must analyze four factors to
28 determine whether the portion of the property entered is curtilage: (1) the proximity of the

area to the home, (2) inclusion of the area within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by passers-by. *Dunn*, 480 U.S. 301. However, the parties disagree as to whether the parking space at the Glendale Apartment constituted curtilage.

### 2.  Discussion

Defendant argues that the area is curtilage because it sufficiently meets these factors. Defendant asserts that the proximity factor is met because the parking spot is adjacent to the wall of the apartment building and to the entrance of the stairwell leading to the above apartments, and directly in front of the assigned garage. In terms of the enclosure and protection from view factors, Defendant asserts that, because the spot was within a gated and walled complex, it was protected from view of the non-resident general public. Finally in regard to the use factor, Defendant points to the parking spot's use for car storage. Defendant argues that no reasonable officer could believe that a parking space situated like this one was not curtilage.

The Government argues that the parking spot is not curtilage. The Government asserts that, because the parking spot was on the ground floor, while the target apartment was on the third floor, the spot was not close enough in proximity to the home. As to the enclosure factor, although the complex itself was enclosed, the parking spot had no individual enclosure. As to the use factor, the Government asserts that the space could be used by any visitor to the apartment. Further, the Government asserts that the spot was visible to anyone with access to the complex and there were no additional barriers or steps taken by the Defendant to protect it from view.

In *Perea-Rey*, the Ninth Circuit Court of Appeals held that a carport adjacent to a home was within the curtilage of the home. *United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012). The Ninth Circuit Court of Appeals based this finding on an analysis of the *Dunn* Factors. *Id.* at 1184. The Court of Appeal's finding was based on the fact that the carport was directly adjacent to, and shared a facade with the one story home, contained a door leading directly into the home, was enclosed by walls and a roof, as well as an iron

fence surrounding the property, the defendant used the carport to store valuable personal belongings, and the defendant took steps to shield the interior from viewing by those outside of the fence. *Id.* at 1184-85.

Unlike the carport in *Perea-Rey*, the parking spot in this case contained no direct access to the home of the Defendant, and moreover, the location of the carport was under the overhang of the second floor, not the third floor where the Defendant's apartment was located. The use factor is not sufficiently satisfied because, unlike the multiple items stored in the carport in *Perea-Rey*, this carport housed only part of the car itself. Furthermore, because any resident of the complex, or visitor thereto, had freedom of access to the spot, the police could have reasonably believed this area was not within the curtilage of the home.

### III.     Conclusion

Accordingly, because the Good Faith exception applies to law enforcement conduct made in reliance on then-binding circuit precedent and law enforcement did not invade the curtilage of the Defendant's residence when attaching the GPS tracking device to Defendant's vehicle, the motion to suppress is denied.

Based on the foregoing,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence Obtained Via GPS Monitoring (Doc. 110; Doc. 122; Doc. 200) is denied.

DATED this 28th day of November, 2012.

James A. Teilborg
United States District Judge