**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,   )   | CR 11-2265-PHX-JAT-003 |
| Plaintiff,   )   | **ORDER** |
| vs.   )   | |
| Rafiq Albert Brooks,   )   | |
| Defendant.   )   | |

Pending before the Court is Defendant Brooks' Motion to Suppress Evidence Obtained from Pole Camera Surveillance. (Doc. 123). On October 31, 2012 at 1:00 p.m. and November 5, 2012 at 9:00 a.m., this Court held an evidentiary hearing on the Motion to Suppress. The Court now rules on the Motion.

**I.    BACKGROUND**

In March 2011, Special Agents and Task Force Officers of the DEA began an investigation into a Jamaican Drug Trafficking Organization ("DTO"). The DTO was suspected of packaging bulk marijuana and then either distributing or shipping the packages to others for further distribution.[1] The case agent for the DTO, Detective Kurt Kinsey, testified that this investigation led law enforcement officers to set up surveillance on 17212

---

[1] Although there are various facts regarding the investigation of Defendant in this matter, this background section only attempts to set forth the facts relevant to the motion at issue.

N. Scottsdale Rd., # 2072, Scottsdale, AZ (the "Scottsdale Apartment"). Detective Kinsey testified that co-Defendant Bianca McKinney was on the lease of the Scottsdale Apartment, and a large quantity of packing supplies seen at the apartment, along with "heat runs"[2] from occupants of the Scottsdale Apartment, aroused suspicion that the Scottsdale Apartment was being used by the DTO in connection with drug trafficking. Detective Kinsey testified that these suspicions were heightened on two occasions: first, when two Hispanic men were pulled over and found to have about $296,000 in a bag after leaving the Scottsdale Apartment, and second, when the driver of a black Taurus that had just visited the Scottsdale Apartment mailed a package that contained marijuana, which was subsequently seized by the Postal Inspector.

Detective Kinsey testified that, through the use of a pole camera aimed at the Scottsdale Apartment, on May 18, 2011, law enforcement learned that a U-Haul moving truck and co-Defendant McKinney's white Civic were being loaded with furniture from the Scottsdale Apartment. Detective Kinsey testified that he then followed both vehicles to Apartment #3096, 6610 N. 93rd Avenue, Glendale, AZ (the "Glendale Apartment"). Detective Kinsey testified that he then pulled into the Jobing.com Arena parking lot and observed the furniture being unloaded from the U-Haul and white Civic into the Glendale Apartment and the garage assigned to that unit.

Detective Kinsey testified that the Glendale Apartment is located within the apartment complex known as the Pillar at Westgate, which is comprised of 251 apartment units that are housed in several buildings, and that co-Defendant McKinney was on the lease of the Glendale Apartment at the time. Detective Kinsey testified that the Glendale Apartment is located in Building "L" of the Westgate complex, and that the complex is located 200 yards

---

[2] A "heat run" is described by Detective Kinsey to be a maneuver performed by a suspected drug dealer with the purpose of detecting the presence of law enforcement surveillance. An example given by Detective Kinsey occurs when a suspect who is being followed by police surveillance purposefully drives into a cul-de-sac and turns around to determine who is monitoring the suspect's activities.

1 directly east of the Jobing.com Arena and the arena's open-air parking lot. Detective Kinsey 2 testified that the Westgate complex is surrounded by a five foot ten inch wall that separates 3 the complex from the Jobing.com Arena parking lot, and that this wall had openings in the 4 wrought iron openings and in the brickwork that allowed a person walking by to see into the 5 complex and the Glendale Apartment parking area. Detective Kinsey also testified that 6 Building "L" has three floors, with east and west stairwells that connect each floor to the 7 ground, and that the front doors of the apartment units are accessible from a common 8 breezeway on each floor.

9 Detective Kinsey testified that, on June 16, 2011, with permission from the arena's 10 head of security and a belief that the Glendale Apartment was a new location associated with 11 the DTO, investigators affixed a camera to a service pole on the Jobing.com Arena. Detective 12 Kinsey testified that the camera was being utilized because previous locations connected to 13 the DTO, including the Scottsdale Apartment, had drug and money seizures associated with 14 their occupants, and the pole camera footage of the Glendale Apartment, which could be 15 viewed and monitored from police computers, would assist law enforcement in identifying 16 patterns, co-conspirators, boxes, drop-offs and deliveries. Detective Kinsey then testified that 17 the Westgate location of the Glendale Apartment made it hard for officers to get to the area 18 to provide surveillance, and that the pole camera would allow for "24/7" remote surveillance 19 of the Glendale Apartment to alert police when to perform physical surveillance.

20 Detective Kinsey testified that the camera was fixed, but had the ability to zoom and 21 pan. Detective Kinsey testified that the camera was not motion-sensored, but was manually 22 operated and typically faced east toward the western side of Building "L." Detective Kinsey 23 testified that law enforcement had the capability of moving the camera's viewpoint up, 24 down, east or west, but the camera could not read license plates of vehicles associated with 25 the Glendale Apartment because its view would get distorted and out of focus if it was 26 zoomed in that far. As seen in Government's Exhibit 2, which is a still shot of a typical view 27 from the pole camera, the camera allowed for the monitoring of Building "L's" west 28 stairwell, the building's balconies, and the surrounding open parking spaces and parking lot.

Detective Kinsey testified that the Glendale Apartment was on the third floor and had two balconies, and the Glendale Apartment's front door, which faces south, was not within the camera's view. Detective Kinsey testified that people walking by the Glendale Apartment or in the Jobing.com Arena parking lot would have a similar view as the pole camera, and that there were no barriers or obstructions to prevent him from accessing the Glendale Apartment. Detective Kinsey added that he obtained access to the Glendale Apartment complex via an unlocked pedestrian gate off of 93rd Avenue on the morning of November 9, 2011 to place a global positioning system ("GPS") tracking device on a Silver Buick. Although Detective Kinsey did testify that each apartment had carports on the ground floor that were assigned and separated by pillars, he also testified that there were no obstructions to stop people from walking between carport spaces and that people did not need to access the western stairwell by way of the carports alone, but could also use the complex parking lot to get there.

Officer Morse testified that, after the pole camera's installation, law enforcement monitored the Glendale Apartment via the pole camera and, on one occasion, saw what looked to be bales of marijuana wrapped up in a blanket carried up the stairs and into the apartment. Detective Kinsey testified that, on another occasion, the pole camera allowed him to see that packing materials, including packing peanuts, were brought into the Glendale Apartment. Detective Chris DiPiazza testified that, after his independent investigation of Christopher Paul Stone merged with the investigation of the DTO, he was able to view live footage and tape from the pole camera focused on the Glendale Apartment to observe Mr. Stone show up to the Glendale Apartment and, on one occasion, remove boxes from the Glendale Apartment and load them into his vehicle before driving away. Detective DiPiazza also testified that he observed camera footage of boxes and other packing materials being carried in and out of the Glendale Apartment on multiple dates.

Officer Morse also testified that, in August 2011, law enforcement was able to make seizures of marijuana being sent through the mail based upon the camera's footage of the Glendale Apartment. Specifically, Detective Kinsey testified that the pole camera at the

1   Glendale Apartment allowed law enforcement to observe that a silver Buick left the Glendale
2   Apartment on the morning of November 9, 2011. Detective Kinsey then testified that the
3   silver Buick stopped at a location near the intersection of Cave Creek Road and Bell Road
4   in Phoenix, and continued to Apartment #1180, 1601 East Highland Avenue, Phoenix, AZ
5   (the "Highland Apartment"). Detective Kinsey further testified that, after the Silver Buick's
6   stop at the Highland Apartment, Defendant drove the Silver Buick to a U.S. Post Office in
7   Glendale, Arizona, where he mailed a parcel that contained 5.5 kilograms of marijuana.
8   Defendant testified that he shipped the package that contained marijuana on December 9,
9   2011, but he did not know that marijuana was in the box. Defendant further testified that
10  someone told him to mail the box, but he did not remember who, and that he was under the
11  impression that there were clothes inside.
12          Subsequent to the pole camera activity at the Glendale Apartment, as Officers Morse,
13  Chris Crescione, Detective Kinsey, and Detective DiPiazza all testified, there were multiple
14  arrests made at the Highland Apartment complex on November 17, 2011. Officer Morse
15  testified that, on that occasion, after Defendant was arrested, Defendant claimed ownership
16  of a silver Buick in the Highland Apartment parking lot, and consented to its search. Officers
17  Morse and Crescione testified that they both searched the silver Buick and that Officer
18  Crescione found a handgun located near the center console in the vehicle. Officer Crescione
19  testified that the handgun was found on the passenger side of the center console with the grip
20  of the weapon exposed out of the plastic molding that was peeled back to house the handgun.
21  After the events on the day of November 17, 2011, law enforcement executed warrants on
22  the Glendale Apartment and the Highland Apartment.
23          Defendant argues that his Fourth Amendment rights were violated when a pole camera
24  was placed on Jobing.com Arena without a warrant.  Defendant argues that all evidence
25  obtained against him due to the use of the pole camera should be suppressed. Defendant
26  argues that such evidence includes: footage that led to the seizure of marijuana that was
27  dropped off at the Post Office by Defendant on November 9, 2011, the pole camera video
28  from the Glendale Apartment, Defendant's statements to agents, items found in the Glendale

1 Apartment and the Highland Apartment upon the execution of the warrants, the handgun and
2 bullets found in Defendant's silver Buick, the package of marijuana and shipping labels
3 seized on November 9, 2011, and any surveillance video or stills from November 9, 2011.

4 In response, the Government argues that the use of the pole camera did not violate
5 Defendant's Fourth Amendment rights and that much of the evidence that Defendant seeks
6 to suppress was not obtained by the use of the pole camera.

**II.     LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment "embodies 'a particular concern for government trespass,'" and applies "when government officers violate a person's 'reasonable expectation of privacy.'" *Patel v. City of Los Angeles*, 686 F.3d 1085, 1087 (citing *United States v. Jones*, __ U.S. __,132 S. Ct. 945, 950 (2012)). However, "a Fourth Amendment search does *not* occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (*citing California v. Ciraolo*, 476 U.S. 207, 211 (1986)). Building upon this, the U.S. Supreme Court made clear in *Jones* that, while the reasonable expectation of privacy test is not the exclusive test for evaluating whether a Fourth Amendment search occurred, cases "involving merely the transmission of electronic signals without trespass would *remain* subject to the [reasonable expectation of privacy] analysis." *Jones*, 132 S. Ct. at 953 (emphasis in original). As such, to determine whether a search was conducted under the Fourth Amendment, this Court must analyze the Fourth Amendment implications of pole camera surveillance under a "reasonable expectation of privacy" test.

In order to clarify the scope of one's "reasonable expectation of privacy," the Supreme Court has established some guidelines to determine permissible government action. "[W]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Along

- 6 -

those lines, law enforcement agents may utilize their resources to conduct surveillance where they have a legal right to occupy. *See*, *e.g.*, *Florida v. Riley*, 488 U.S. 445, 449 (1989) (citing *California v. Ciraolo*, 476 U.S. 207, 213 (1986)) ("[T]he police may see what may be seen 'from a public vantage point where [they have] a right to be . . . .'"); *United States v. Dubrofsky*, 581 F.2d 208, 211 (9th Cir. 1978) ("Permissible techniques of surveillance include more than the five senses of officers and their unaided physical abilities."). Nothing in the Fourth Amendment prohibits government officers "from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afford[s] them." *United States v. Knotts*, 460 U.S. 276, 282 (1983). Further, the Ninth Circuit Court of Appeals has held that, "the use of photographic equipment to gather evidence that could be lawfully observed by a law enforcement officer does not violate the Fourth Amendment." *United States v. McIver*, 186 F.3d 1119, 1125 (9th Cir. 1999).

### III. ANALYSIS

In support of his motion to suppress, Defendant asserts that the U.S. Supreme Court's recent decision in *United States v. Jones*, 132 S. Ct. 945 (2012) demonstrates that the pole camera evidence should be suppressed. Defendant argues that five members of the United States Supreme Court suggest that long-term continuous surveillance violates a person's Fourth Amendment rights because it allows government officials to record and aggregate a person's activities in a way that violates a person's expectation of privacy.

Defendant argues that a "majority" of Supreme Court Justices would not allow long-term pole camera surveillance because the documenting and cataloging of one's daily associations would develop a picture of one's life that a person would reasonably expect to keep private. Based on this, Defendant argues that the Government was required to obtain a warrant prior for the installation of the pole camera because the video surveillance of the Glendale Apartment allowed law enforcement to generate a record of the schedule of every person at the residence as well as the visitors of the residence. Defendant concludes that this video surveillance of the Glendale Apartment violates one's expectation of privacy.

In response, the Government argues that Defendant's arguments are based merely on

portions of the non-binding concurring opinions in *Jones*, and does not reflect the majority holding. The Government argues that the majority opinion in *Jones* simply analyzed the trespassory nature of GPS installation, but did not inquire about the point where GPS surveillance of a person becomes constitutionally problematic. Furthermore, the Government argues that the *Jones* majority did not adopt a "mosaic" theory, nor did it extend the theory from GPS surveillance to the more limited and non-trespassory fixed pole camera surveillance of a location in public view.

As indicated by Defendant, the *Jones* Court unanimously ruled that the installation of a GPS monitoring device on the defendant's car was a "search" under the Fourth Amendment, but there existed a 5-4 split over the rationale behind that decision. The majority opinion was authored by Justice Scalia and concluded that the physical installation of the GPS device on defendant's vehicle to obtain information was a trespass and constituted a search for Fourth Amendment purposes. *Jones*, 132 S. Ct. at 949. However, the majority expressly declined to consider whether this type of search violated an individual's reasonable expectation of privacy. *Id.* at 954 ("It may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question.").

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment, but opposed the majority's reasoning because the majority's trespassory analysis would "present particularly vexing problems in cases involving surveillance that is carried out by making electronic, as opposed to physical, contact with the item to be tracked." *Id.* at 962 (Alito, J., concurring). The four-member concurrence stated that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy [, but f]or such offenses, society's expectation has been that law enforcement agents and others would not–and indeed, in the main, simply could not–secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 964 (Alito, J., concurring). In the face of a lack of a statutory circumscription of the use of advancing technologies, such as GPS tracking, by law enforcement, Justice Alito then recommended

1  that "[t]he best that we can do . . . is to apply existing Fourth Amendment doctrine and to ask
2  whether the use of GPS tracking in a particular case involved a degree of intrusion that a
3  reasonable person would not have anticipated." *Id.* at 964 (Alito, J., concurring).

4  While it does appear that in some future case, a five justice "majority" is willing to
5  accept the principle that Government surveillance can implicate an individual's reasonable
6  expectation of privacy over time, *Jones* does not dictate the result of the case at hand because
7  it merely reaffirms the reasonable expectation of privacy analysis. *See United States v.*
8  *Graham*, 846 F. Supp. 2d 384, 394 (D. Md. 2012). Accordingly, the Court must determine
9  whether Defendant's reasonable expectation of privacy required law enforcement to obtain
10 a warrant before conducting pole camera surveillance on the parking lot of a gated apartment
11 complex associated with Defendant from a camera whose installation was permitted.

12 Both parties agree that a reasonable expectation of privacy analysis is appropriate in
13 the present case to determine whether a warrant was needed for law enforcement to install
14 and monitor a pole camera at the Glendale Apartment. Defendant asserts a blanket statement
15 that an expectation of privacy analysis should be applied in this situation, without explaining
16 how, and supports this contention solely on the strength of a footnote that states simply that
17 the Glendale Apartment was housed in "a gated community with keypad access" that
18 prevented "the general public" from viewing the "comings and goings at the apartment."
19 (Doc. 123 fn. 4).

20 In response, the Government argues that law enforcement officials did not violate
21 Defendant's Fourth Amendment rights when using pole camera surveillance. The
22 Government asserts that everything viewed on the camera was within public view, and that
23 the casual observation of persons walking or driving by Building "L" in the complex parking
24 lot would yield a similar, if not clearer, view of the same location. In addition, the
25 Government argues that despite the wall that separates the complex and the Jobing.com
26 Arena's open-air parking lot, persons in the arena parking lot are able to observe the
27 Glendale Apartment in a manner similar to the camera's view. In that sense, the Government
28 concludes that the video surveillance of the Glendale Apartment did not violate Defendant's

1 Fourth Amendment rights because law enforcement agents were allowed to use photographic 2 equipment from an area where they were permitted to be. As such, the Government is asking 3 that Defendant's motion to suppress the pole camera evidence from the Glendale Apartment 4 be denied.

In *United States v. McIver*, defendants were found cultivating marijuana on public land, and were monitored by law enforcement through the use of a motion activated camera. *McIver*, 186 F.3d at 1125. The defendants were under the impression that their actions were not being observed, and maintained that the use of unmanned cameras without a search warrant violated their reasonable expectation of privacy. *Id.* Although the marijuana was monitored in a remote area and the defendants did not expect to be seen by the law enforcement's camera, the Ninth Circuit Court of Appeals held that the defendants failed to demonstrate an objectively reasonable expectation of privacy, because law enforcement had a clear right to be in a national forest that was open to the public. *Id.*

The *McIver* Court explained that the use of photographic equipment by law enforcement to gather this evidence did not violate the Fourth Amendment, but was "a prudent and efficient use of modern technology" under the circumstances because it gathered "evidence that could be lawfully observed by a law enforcement officer." *Id.*; *see also Maisano v. Welcher*, 940 F.2d 499, 503 (9th Cir. 1991) (holding that the seizure of automobiles from a deficient tax-payer's driveway by the Government did not require a warrant because it was not shown that the driveway was the location of activities that required Fourth Amendment protection, that the driveway "obstructed or enclosed" in any way, or "that the vehicles seized were not visible from the street.").

Like the officers in *McIver* who installed a surveillance camera in a national forest that they were allowed to occupy, in this case, law enforcement had permission from the head of security at the Jobing.com Arena to install the pole camera on the arena. Thus, officers had a right and permission to mount a camera on the arena, and law enforcement's use of the pole camera affixed to the arena was "a prudent and efficient use of modern technology" to enhance their sense of sight and allowed for law enforcement to see "what may be seen"

from a public vantage point where they had a right to be.

Additionally, as argued by the Government, despite a block wall that could potentially act as an enclosure or barrier that could obstruct the view of a person standing on the outside of the Westgate complex, the typical focal point of the pole camera was visible to any passerby inside the complex or to any person in the arena parking lot. In fact, Detective Kinsey testified that the complex's outer wall also had iron openings that allowed for easy visibility of Building "L" for someone standing outside of the complex. Defendant presented no evidence to rebut Detective Kinsey's testimony that he could simply walk into the complex from the street, leaving Defendant's assertions about the apartment community's keypad access as insufficient to show that there were special features or activities associated with the Westgate complex parking lot to support a reasonable expectation of privacy in the parking lot.

The evidence points to the fact that a person would not be required to be a complex resident to see the "comings and goings" at the Glendale Apartment, and any expectation of privacy by Defendant in the complex parking lot in front of Building "L" from surveillance was unreasonable. Therefore, law enforcement's use of the pole camera did not violate the Fourth Amendment and, thus, there was no need for law enforcement to seek a warrant before using the camera.

Because there has been no violation of the Fourth Amendment by law enforcement in regards to the use of the pole camera, the Court need not determine what evidence the use of the pole camera actually elicited.

**IV.  CONCLUSION**

Based on the foregoing,

///

//

/

1  **IT IS ORDERED** that Defendant Brooks' Motion to Suppress Evidence Obtained
2  from Pole Camera Surveillance (Doc. 123) is denied.
3  DATED this 28th day of November, 2012.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge